G. W. MACFARLANE *vs.* S. M. DAMON, Minister of Finance.

QUESTION RESERVED BY JUDD, C.J.

HEARING, DECEMBER 23, 1889.   DECISION, FEBRUARY 26, 1890.

JUDD, C.J., McCULLY, PRESTON, BICKERTON, DOLE, JJ.

( Mr. Justice Preston died on January 17, 1890, between the hearing and decision.)

The respondent refused to pay the salary of the relator as Chamberlain to His Majesty.

Held, that the appointment of Chamberlain was personal to His Majesty, and did not require the approval of the Cabinet.

Held, that the salary of office follows the title to it.

The Writ of Mandamus is made absolute.

OPINION OF THE COURT BY McCULLY, J. :   DOLE, J., DISSENTING.

The petitioner for the writ of mandamus alleges that the respondent, Samuel M. Damon, is the Minister of Finance, and as·such has charge of the disbursements of the Public Treasury; that in the appropriation bill for the current biennial period there was appropriated for the payment of His Majesty's Chamberlain the sum of six thousand dollars.   That during said period, to wit, on October 1st, 1888, His Majesty appointed under the great seal of the Kingdom and commissioned the·

ᴄ

petitioner his Chamberlain, and that the petitioner has since held and now holds the said office of Chamberlain.

That on July 23d, 1889, and at other times, your petitioner has requested and demanded of the said Minister of Finance the payment of the said salary, but that he undutifully and unlawfully refused and still refuses to pay the same or any part thereof, alleging as his reason that the Cabinet had not sanctioned the appointment of your petitioner to the office of Chamberlain, and that said appointment does not meet with the approval of the Cabinet, all of which more fully appears by copies of correspondence annexed.

But the petitioner avers that he is His Majesty's Chamberlain, and entitled to the salary appropriated by the Legislature for that office, and that there is now due to him the sum of three thousand dollars, to wit, two hundred and fifty dollars monthly for the twelve months from the first of October, 1888, to November 1st, 1889. The petitioner avers his belief that there are now and at all times have been sufficient money in the Treasury from which this salary might have been paid.

The respondent makes return, in substance, as follows :

1. He admits that as such Minister of Finance he has charge of the public funds of the Kingdom, and has had at all times during the year last past sufficient funds available to pay the claim of the petitioner.

2. To so much of said writ as commands this respondent to pay to said petitioner the amount appropriated for the salary of His Majesty's Chamberlain, from the first day of October, 1888, to the 28th day of February, 1889, this respondent represents and shows unto the Court that in an action in this court entitled, " In the matter of the application of George W. Macfarlane for a writ of mandamus, vs. W. L. Green," the said petitioner did on the 6th day of May, 1889, in and by his petition duly filed, seek the payment from said W. L. Green, the then Minister of Finance, of the sum of $1,250.00 ( being the amount alleged by said petitioner to be due to him as salary as such Chamberlain in respect of the time between the dates last aforesaid.)    And that on the said 6th day of May, in pursuance

of said petition, an alternative writ of mandamus was issued out of this Honorable Court to and against the said W. L. Green, Minister of Finance as aforesaid, commanding him to pay to said petitioner said amount of $1,250.00, or to show cause before the Honorable Edward Preston, one of the Justices of this Honorable Court, on the 8th day of May, 1889, why he had not paid said amount. That on the 31st day of May, 1889, said Wm. L. Green, Minister of Finance, as aforesaid, filed in this Honorable Court his return to said alternative writ of mandamus, wherein he did show cause why he had not paid said sum to said petitioner, and did pray that said alternative writ, so issued and directed to him, as aforesaid, be dismissed. And that the said cause having been then and there submitted for the decision of said Justice upon said alternative writ and the return thereto, the said Justice did thereafter, to wit, on the 12th day of June, 1889, render and file his decision in said cause, wherein and whereby the said Justice did consider and adjudge that the said petitioner had not shown himself entitled to the payment of said salary so claimed by him as aforesaid, and did refuse to issue a peremptory writ against the said Minister of Finance to compel the payment thereof; to the records and files, in which said last mentioned cause, this respondent especially refers this Honorable Court herein, and makes a part of this, his return.

3. And that the judgment of said Justice and Court so rendered on said 12th day of June, 1889, still stands and obtains as a valid and decisive adjudication of the claim of said petitioner to said salary, in respect to the time between said 1st day of October, 1888, and the 28th day of February, 1889, inclusive.

4. And said respondent not waiving the above defense, or any part thereof, but insisting thereon as a valid defense to the alternative writ issued herein, especially as refers to so much of petitioner's claim herein as was adjudicated as aforesaid, doth further represent unto this Honorable Court, as follows :

5. That he denies that said G. W. Macfarlane was appointed as His Majesty's Chamberlain on the 1st day of October, 1888, or at any other time, and denies that said George W. Macfarlane

is or ever has been appointed as such Chamberlain, but states the truth to be as follows:

6. That on the said 1st day of October, 1888, said George W. Macfarlane was absent from this kingdom, and remained continuously absent thereafter for a long period, to wit, about five months, when he returned to this kingdom, until, to wit, the month of October, 1889.

7. And respondent further represents that His Majesty's Chamberlain is a public officer of the Hawaiian Government assigned for the purposes of said government to personal attendance upon His Majesty and the Royal Household, and as a medium of communication between His Majesty and His Majesty's ministers, and charged with the supervision of the ceremonies pertaining to the presentation to His Majesty of the officers of foreign governments and of foreign dignitaries, and is in other respects closely attendant upon the person of His Majesty, and necessarily cognizant of many of the private and public concerns of the Sovereign, and of the affairs of the Government.

8. That the character of the Government here existing, and of the Constitution under which we live, contemplate and demand that His Majesty's Chamberlain should be personally and politically acceptable to the Cabinet of the day, and in order to the validity of the appointment of any person as such Chamberlain, such appointment should have the sanction and consent of the Cabinet. That it is not contemplated by the Constitution, or by the Act of the Legislature, whereby the salary of such Chamberlain is appropriated, that such salary should be drawn by any person claiming to hold such office if such claim be opposed to the wishes and policy of the responsible ministers of His Majesty for the time being, nor without the consent of the Cabinet.

9. And your respondent further represents that said G. W. Macfarlane has not been appointed to said office of His Majesty's Chamberlain, and does not hold and has not held such office, by or with the consent or sanction of His Majesty's Ministers, or any of such Ministers. And that said petitioner's pretended

appointment to said office, if made or attempted to be made at all, was so attempted to be made by His Majesty personally, without the consent or sanction of His Ministers, or of any of such Ministers, and without any legal authority in His Majesty, in the absence of such consent or sanction, to make such appointment, or to confer upon the said petitioner, by virtue of such pretended appointment, any right to collect or receive the said salary, or any part thereof.

10. And this respondent further represents that during the year next following said petitioner's pretended appointment to said office, on October 1st, 1888, he, the said petitioner, did not perform the duties of His Majesty's Chamberlain, or any of them, but that the said duties were performed by another, to-wit, James W. Robertson, the said petitioner having been during almost all of said year, as hereinbefore described, absent from this Kingdom.

11. Wherefore said respondent respectfully submits that the foregoing constitutes sufficient cause for his not having paid to said G. W. Macfarlane the salary of and pertaining to the said office of His Majesty's Chamberlain, and prays that said writ so issued and directed to this respondent herein, as aforesaid, be dismissed.

The application for the writ was made to the Chief Justice, who made no order, but after argument reserved the matter for. the consideration of this Court upon argument before it.

## BY THE COURT.

In determining the controversy raised by these proceedings, the controlling question of principle is whether the King's Chamberlain is such an officer as is required to be commissioned to his office in order that his acts therein may be legalized, and whether his appointment requires to be approved by the Cabinet.

We adopt here the language of our lamented associate, Preston, in the case referred to in the respondent's return, of this petitioner *vs.* Wm. L. Green, the preceding Minister of Finance. He says:

"It will be necessary in the first place to consider what is the status of the Chamberlain. It is not a statutory office, the duties appertaining to which are defined by law. The statutes creating the office and defining the duties were repealed by the Civil Code in 1859, and until the session of the Legislature of 1864–5 no provision was made for the payment of such an officer, when an appropriation of $5,000 was made for the 'salary of His Majesty's Chamberlain and Secretary,' and the appropriation for 'Chamberlain and Secretary' continued until 1888, when it appears as 'Chamberlain' only.

"The duties of the Chamberlain have been personal to His Majesty, and it is now for the first time, so far as I am aware, and I have had many opportunities from my connection with former governments of knowing, that the right of the government to approve of the appointment has ever been asserted, and it is not suggested by the respondent that it has been.

"The Attorney-General in his brief refers to the practice in Great Britain where such an official would retire with the Ministry, and refers especially to the question which arose early in Her present Majesty's reign as to the appointment of the Bedchamber Women, and claims that by analogy the same rule should apply here.

"I do not think there is such analogy ; the rules regulating the holding of offices in Great Britain and the responsibility of Ministers have been the growth of centuries, and are not and cannot be applicable here according to our constitution. In fact, if the practice obtaining in Great Britain were applicable and in force here, the Court would not have to consider this case, because if His Majesty would not act upon the advice of his responsible advisers in matters in which they consider themselves responsible, they would have to give way or resign.

"I am of opinion that the office of Chamberlain is personal to His Majesty, and that there is no legal necessity for the appointment to be by commission or in writing, and that it does not require the approval of the Ministers.

"Should a person be appointed to the office whom the Ministers consider objectionable, they can exercise some control in

the Legislature by declining to ask for a vote for the salary." (6 Hawn., 715.)

We may regard it as a crucial test of the requirement of a commission, to consider whether the acts of the officer are legal or illegal, valid or invalid, as he may be commissioned or not. The statute of 1850, prescribing in amendment certain duties to the Chamberlain, was repealed in 1859, likewise the statute of 1848 providing for his appointment. By this earlier statute it was made obligatory on His Majesty, with the approbation of the Privy Council, to appoint a Chamberlain of the Royal Household, who shall be solely entitled to draw upon the Minister of Finance for all the expenses of the Royal Household, and it shall not be lawful for any person in this Kingdom to debit His Majesty or any other person on his behalf, except the Chamberlain, such debts not to be recoverable at law. No check or draft of the King on the treasury could be paid unless it was countersigned by the Chamberlain, and the Chamberlain might be held personally liable to creditors for expenditures in excess of the stated allowance.

The legal inference from the repeal of the statutes which required a Chamberlain to be appointed with the approval of the Privy Council, and which gave him powers and duties, there being no other statutes enacted concerning him, is that the Chamberlain is not now an officer of the law. His office not being established by law, and no duties being prescribed by law, he requires no commission, and he requires no oath of office. Without an appointment by commission of the King, what would there be for the Cabinet to approve of? Without legal duties, what is there done by him which requires a legal appointment? What acts of his are made valid by such appointment, and invalid without it? The clause in the appropriation bill is merely a provision for the payment of a Chamberlain. The item is placed in the civil list, one of the five which constitute that department of the appropriation bill. We see no reason why this should be placed more under the direction of the Cabinet than any of the others. There are allowances to three Royal personages, the fifth is for His Majesty's household

expenses.   It is not obligatory on the King to  appoint a Chamberlain.   He might appoint one without this extra provision for salary, paying him out of the grant which he receives for the state and expenses of the occupant of the throne.

There is, as we see and are informed, no warrant in the repealed statutes or in the precedents and practice following thereafter for the statement in the seventh article of the respondent's return, that the Chamberlain is a public officer of the Hawaiian Government, assigned      *     *     *     as a medium of communication between His Majesty and His Majesty's Ministers, *     *     *     or that he is necessarily cognizant of many of the     *     *     *     public concerns of the Sovereign, and of the affairs of the Government.   The Chamberlain attends no meetings of the King and Cabinet, and has no official knowledge of public business.   If he is a medium of communication between the King and the Cabinet, it is as a servant.   If he has influence with the King which may be adverse to the policy of the Cabinet, it is only as a friend, and the influence of the King's friends cannot be controlled.

The opinion of the Justices rendered to the Cabinet August 3, 1889, in reply to their request for a definition of the King's powers under the Constitution, concludes that " acts of the King are done upon the responsibility of His Cabinet, unless it appears from express words or by the very nature of the case that the act is of a personal character."   (7 Hawn., 784.)   Holding, as we do, that the office of Chamberlain is of a non-political and non-legal character, and the service personal to His Majesty, his designation of the person who shall perform the service is an act of the latter description, and the Cabinet is not responsible for it.

The defense of *res judicata*, set up in the second and third articles of the return, does not stand on the principle which supports such pleas.   The plaintiff herein has not had an adjudication against him which he has allowed to become final.   He had appealed from the decision of the Justice hearing his application for a mandamus against the then Minister of Finance.   Before the case could be heard by the Appellate Court, the Minister, Mr.

Green, had resigned. It would then have been futile to proceed to obtain a mandamus directing Wm. L. Green to pay money from the Government treasury. It was impossible to substitute Samuel M. Damon in the appellate proceedings inasmuch as he had not made the refusal on which the mandamus was asked. The plaintiff's proceedings in the first instance, therefore, terminated without prejudice, and it would be a denial of justice not to allow him to commence again after a demand on the new incumbent, which was refused.

See *U. S. vs. Boutwell*, 17 Wallace, 604.

The third ground upon which the payment of the salary is refused, as set forth in the sixth and tenth articles of the return, is that the petitioner has not in fact performed the duties of the office. In this case the petitioner makes replication by affidavit that while absent from the Kingdom he was performing duties for His Majesty, having gone abroad by his command, and that provision was made for the performance of the Chamberlain's duties near his person by a Vice-Chamberlain whom he pays out of his salary. This is a duplicate or collateral defense, not consistent with the ground that the relator was not the Chamberlain for the want of a sufficient appointment. In considering whether he performed Chamberlain's duties, we treat it on the ground that he was duly appointed. Can the Minister of Finance inquire into the performance of the duty of an office by the incumbent thereof and refuse to pay the salary if he judges there has been no performance. The first answer in this particular case of a personal appointment held at the pleasure of the appointing power would be, that if it is satisfactory to him, the Minister of Finance may not examine into the performance of the service. And this rule may be carried further. Could it be claimed that the Minister can pass upon the right to salary of any clerk or other appointee of any of the departments? But the rule extends still further to public officers other than those holding at the pleasure of appointing powers, that is to say, to superior officers holding office by commission. It is clearly established that the compensation of an office does not depend on time or

labor expended in discharging the duties of it, but upon the title to it. The salary follows the title. Any other rule than this would admit an intolerable scrutiny by the Minister of Finance into the measure of the services of every officer in the Government, and the principle legitimately carried out would empower the Minister to make partial payment in proportion to the amount of the service as he should determine it. Not in this way can faithful performance of duty be insured or the omission of it be punished.

*People vs. Tieman*, 8 Abb., 359. *Mayfield vs. Moore*, 53 Ill., 428. *Com. vs. Bowman*, 25 Penn., 23. *O'Leary vs. Board of Education*, 93 N. Y., 1. *Dorsey vs. Smyth*, 28 Cal., 21.

The writ is ordered to be made absolute.

*Paul Neumann* and *Charles L. Carter*, for the relator.

*C. W. Ashford*, Attorney-General, and *A. P. Peterson*, deputy, for the respondent.

ADDITIONAL VIEWS OF CHIEF JUSTICE JUDD.

In addition to the above opinion of the Court I wish to add the following:

Article 78 of the Constitution, that prescribes that "whenever by the Constitution any act is to be done or performed by the King or the Sovereign, it shall, unless otherwise expressed, mean that such act shall be done and performed by the Sovereign by and with the advice and consent of the Cabinet," has no application to the question whether the appointment of Chamberlain to His Majesty requires to its validity the advice and consent of the Cabinet, for the Constitution makes no mention of the office of Chamberlain. So, also, the statute of 1887, which places a similar construction upon "any act or thing commanded or permitted to be done by the King by virtue of any statute of this Kingdom," has no application, for the office of Chamberlain is not created by statute. In the absence of any constitutional requirement or statute law, what ought to control in the decision of this matter? The obvious answer is, the nature of the office, its duties and responsibilities, as established by Hawaiian precedents. These all go to show that the

Chamberlain has been the business agent of the King. He draws the King's allowance from the State Treasury, disburses it at His Majesty's pleasure, officiates at public receptions and Palace festivities and receives the guests, regulates public ceremonies, attends His Majesty on public occasions, and does similar duties, all, however, of the nature of personal service to the King. Until the last appropriation bill the item for salary of Chamberlain has been for "His Majesty's Chamberlain and Private Secretary," and with but one exception the two offices have been held by the same person. And although the title, "Private Secretary," is now dropped from the appropriation for Chamberlain, there is no doubt that the Chamberlain will also discharge the duties of Private Secretary to the King.

The Chamberlain has no political function whatever to perform. He is, unlike all other officials, in no department or bureau of the Government. The course has been heretofore to appoint him by virtue of a commission from the King. It is not clear whether this commission has been usually countersigned by a Minister, but it is certain that the King's appointment of a Chamberlain has, uniformly, with the exception only of the case now before us, been accepted by the Cabinet without question. Much might be said on both sides of the question whether the appointment of the Chamberlain should be the personal act of His Majesty, or be a Cabinet appointment. But the question as to which method would be the wisest is one of policy, a matter of legislative action, and does not come into the present discussion. What we are to consider is the present status of the appointment as found from the precedents of the past history of the country. It has always been a personal appointment by the King. If the law-making body should deem it proper to make it a Cabinet appointment, a statute would accomplish this.

Unless there be some statute prescribing the method of appointment, the officers of the Government are appointed by the head of the department whom the official is to serve. An illustration of this is found in the appointment of a short-hand reporter to the Supreme Court, for whose salary an appropriation

was made. There is no statute creating the office or designating by whom the appointment should be made. The natural inference would be that the Supreme Court, whom the stenographer is to serve, should select and appoint this official. The analogy holds good as regards the appointment of the Chamberlain. He is to serve the King personally—more so than in the sense that all public officers serve him—the King therefore appoints him.

### DISSENTING OPINION, BY DOLE, J.

The plaintiff alleges in his petition that on the first day of October, A. D. 1888, His Majesty Kalakaua "over his name and under the great seal of the Kingdom appointed and commissioned your petitioner one of the officers of his household, to wit, his Chamberlain, as will more fully and particularly appear by a copy of the said commission issued to him, hereto annexed, marked Exhibit A., and hereby expressly made a part hereof, and that your petitioner has held and does now hold the said office of His Majesty's Chamberlain, subject and at all times obedient to the commands of His Majesty the King," and that he has demanded of the respondent the payment to him of the salary appropriated by the Legislature of 1888 for His Majesty's Chamberlain, but that the respondent undutifully and unlawfully refused and still refuses to pay the same or any part thereof, " alleging as his reason that the Cabinet has not sanctioned the appointment of your petitioner to the office of Chamberlain as aforesaid, and for that said appointment does not meet with the approval of the Cabinet, all of which doth more fully appear by the copies of the correspondence which has passed between the said Samuel M. Damon, Minister of Finance, and your petitioner, hereunto annexed, marked Exhibit B, and made a part hereof."

The plaintiff claims to be entitled to three thousand dollars for twelve months' service as such Chamberlain, and prays for a writ of mandamus to compel the respondent to make payment thereof, or show cause for refusing.

Such an alternative writ was issued, returnable on the 13th

day of November, A. D. 1889, before Judd, C. J., in chambers.

The respondent in his answer gives three reasons why he cannot be legally called upon to pay the said salary, to wit:

First: That the case of *Macfarlane vs. Green*, 6 Hawn., 711, was a similar proceeding with the present, and for a portion of the identical sum of money claimed herein; and that in those proceedings it was adjudged that the petitioner had not shown himself entitled to the salary therein claimed, and that such judgment still stands as a decisive adjudication of the claim in the said cause.

Second: That the alleged appointment of the petitioner is invalid because it has not received the approval of His Majesty's Ministers or any of them.

Third: That during the year next following such alleged appointment of the petitioner as Chamberlain he did not perform the duties of Chamberlain, being absent from the Kingdom during the greater part of such year, the said duties being performed by another.

The correspondence exhibited is occupied mainly with a discussion of the second and third grounds above set forth.

A hearing was had on the 21st day of November, A. D. 1889, before the Chief Justice, who reserved the questions raised for the consideration of the full Court.

In regard to the first ground of defense, *i.e.*, that the judgment entered in the case of *Geo. W. Macfarlane vs. William L. Green*, Minister of Finance, has finally adjudicated a portion of the present claim : it is clear to me that the position is untenable. An appeal was made from that decision to the Full Court, which appeal was abated by the resignation of William L. Green from the office of the Minister of Finance. The effect of the termination of the case at that stage, *i.e.*, pending appeal, by abatement, could not be different from the effect of a similar disposition of the case while it was pending in Chambers, which would simply be a cessation of the proceedings without prejudice.

The second cause shown by the respondent why he cannot be legally called upon to pay the claim, *i.e.*, that the alleged ap-

pointment is invalid without the approval of the Ministry, or any of them, which has not been given, necessitates a consideration of the principles of our Government.

From the death of Kamehameha I. until the promulgation of the present Constitution, the executive authority of the Government was shared between the Sovereign and Kuhina Nui, or the Ministry. The office of Kuhina Nui became obsolete in 1864 with the abrogation of the Constitution of 1852. The executive power of the Sovereign was somewhat increased by the Constitution granted by Kamehameha V. in 1864, for although it enacted that "no act of the King shall have any effect unless it be countersigned by a Minister," it also provided in the same article that the Ministers "shall be appointed and commissioned by the King, and hold office during His Majesty's pleasure, subject to impeachment," while there is no recognition in the previous Constitutions of any authority in the Sovereign to dismiss the Kuhina Nui. It also enacted that "to the King belongs the executive power." The enactment of ministerial responsibility in the Constitution of 1864 was never very definitely understood or interpreted, and the reason of this is in its inconsistency with the other provisions above quoted, that the Ministers shall hold office during the King's pleasure, and "to the King belongs the executive power." And yet there was in the administration of affairs during the reigns of Kamehameha V. and Lunalilo a general recognition of ministerial responsibility to the country, and of ministerial executive authority, and neither of these Sovereigns interpreted the constitutional provision that the Ministers should "hold office during His Majesty's pleasure," to mean that they might dismiss the Cabinet for private reasons.

In the present reign the principle of ministerial responsibility, thus feebly sanctioned by the fundamental law, has been gradually and steadily undermined until it finally ceased to exist under the encroachments of the Crown, and the whole executive authority became centered in the person of an irresponsible Sovereign. The revolution of 1887 was a public protest against this political status, and the Constitution of that year, which is now our fundamental law, was intended to remove

the evil and to make its return impossible. This instrument marks a new departure in the administration of our Government; by its preamble it states the reason of it to be that the old Constitution contained "many provisions subversive of civil rights and incompatible with enlightened constitutional government," and that its promulgation was necessary to the maintenance of the Government. It enacts that the Ministers shall be removed by the King only upon a vote of want of confidence passed by the Legislature, or upon conviction of felony; that the executive power is in the King and the Cabinet; that every sovereign act required by the Constitution shall .be performed only with the advice and consent of the Cabinet, except where the provision for such act dispenses therewith, and that all existing laws and parts of laws repugnant to its provisions are null and void. It ushered in a new political dispensation—a dispensation clearly and emphatically of public administration of affairs by responsible officers only. This principle of Government was ratified and extended—if that were possible—by the Legislature in a law passed on the eigth day of December, A.D. 1887, and approved by the King, which declares: "Whereas, it is consistent with the spirit of the Constitutional Government of the Hawaiian Kingdom that the Sovereign shall act in all matters of State only by the advice and with the consent of his constitutional advisers; therefore, be it enacted, etc.: Wherever by virtue of any statute now in force in this Kingdom, or which shall hereafter be in force therein, any act or thing is commanded or permitted to be done or performed by the King or the Sovereign, it shall, unless otherwise expressed, mean that such act or thing shall be done and performed by the Sovereign by and with the advice and consent of the Cabinet."

Even with these clear and definite enactments of this principle of government, His Majesty has failed to realize and understand its meaning and to accept its full application to the administration of affairs. This attitude upon his part at at length culminated in an open breach of harmonious relations between the King and the Cabinet on the third day of August, A.D. 1889, when the Cabinet requested the opinion of the Jus-

3

tices of the Supreme Court upon the matter at issue under the following submission :

"HONOLULU, H. I., Aug. 3, 1889.

" *To the Hon. A. Francis Judd, Chief Justice Supreme Court.*

"SIR : The Cabinet desire to submit for your consideration the following statement of facts, and respectfully request the opinion of the Supreme Court upon the question hereinbelow stated :

## "Statement of Facts.

" His Majesty the King claims the right to exercise his personal discretion in and concerning the performance of official executive duties of the Sovereign, such as making appointments requiring the Royal signature ; appointment and removal of diplomatic and consular officers accredited by the Hawaiian Government abroad ; the acknowledgment of foreign diplomatic and consular representatives from abroad to the Hawaiian Kingdom ; the authority over and control of the military forces and munitions of war belonging to the Hawaiian Government, etc.

" His assertion of and action in pursuance with this claim has now come to such a point that the orderly progress of the business of the Government is seriously interfered with and the preservation of the public peace menaced.

" Under these circumstances the Cabinet this day formulated and presented to His Majesty the following statement of principles, viz. :

" ' Before going further, the Cabinet desire a through understanding with Your Majesty upon the following point, viz. : The Government in all its departments must be conducted by the Cabinet, who will be solely and absolutely responsible for such conduct. Your Majesty shall, in future, sign all documents and do all acts which under the laws or the Constitution require the signature or act of the Sovereign, when advised so to do by the Cabinet, the Cabinet being solely and absolutely responsible for any signature of any document or act so done or performed by their advice.'

" The Cabinet advised His Majesty that such statement of principles is in accordance with the Constitution, and that it was his duty to assent thereto.

" In reply to such advice by the Cabinet, His Majesty replied that he considered the request to consent to such statement of principles as uncalled for and insulting, and declined to assent thereto.

" The Cabinet therefore respectfully request the opinion of the Supreme Court upon the following question, viz. :

" Is the authority and responsibility of the Cabinet, as set forth in the above statement of principles, in accordance with and in pursuance of the Constitution or not ?"

The Justices of the Supreme Court, in their reply, unanimously and without qualification sustained the principles of responsible government in the following language : " There can be no dual government. There can be no authority without responsibility. The King is without responsibility. The Constitution confers the responsibility of government upon the Cabinet ; they therefore have the authority. With this in view, we are unanimously of opinion that the principles formulated by you and presented to His Majesty, above set forth, are in accordance with and in pursuance of the Constitution." (7 Hawn., 784.)

This somewhat sweeping application of the principle under consideration allows no exception which is not allowed by the Constitution and laws. It tacitly repudiates the method of application of the 78th Article of the Constitution, which was adopted by the Court in the case of *Everett vs. Baker* (7 Hawn., 229), popularly known as the Veto Case. The Court in that case say : " Since the 78th Article (of the Constitution) contains the words ' unless otherwise expressed '; therefore any act of the King which does not, by force of the article which defines the act, require the consent of the Cabinet, is excepted from the operation of the general rule laid down in Article 78." If it is conceded that the reasoning of this part of that decision is untenable, an important step is gained toward a clear and consistent interpretation and application of the law upon this subject, and the meaning of the 78th Article of the Constitution may be

confidently stated to be that there is no exception to the rule
that every Sovereign act must be " by and with the advice and
consent of the Cabinet," unless the law defining such act shall
make it an exception.

This brings us down to the consideration of the question em-
braced in the second ground of defense to this application for a
writ of mandamus. Is the appointment of the Chamberlain an
act of the Sovereign which is required by our Constitution and
laws, as interpreted by the Justices of the Supreme Court in
their opinion of August 3rd, 1889, to be done by and with the
consent of the Cabinet ? To answer this question it is necessary
that the nature of the office of Chamberlain should be clearly
understood. · Is it a public or private office?    Does the Cham-
berlain in our government hold the same relation to His Majesty
and to the public as does the King's coachman or his cook, as
was urged in the argument in this case?

I think there can be no question that the position is a public
one and that the appointment is an official act, or, to bring it
within the words of the opinion of the Supreme Court of Aug-
ust 3rd, 1889, is an executive act, for the following reasons:
The office of Chamberlain has been a feature of this government
almost from the time it became a constitutional monarchy.
From 1846 to 1850 the duties and powers of the Chamberlain
were prescribed by law.  Since 1850 to the present time the of-
fice has been continued, and from the year 1864 has been recog-
nized by every Legislature by an appropriation for the salary
of the incumbent.   The office has during this period been
closely patterned after the similar office of Lord Chamberlain
of England.   The description of a "royal chamberlain" in the
Encyclopædia Britannica correctly defines the office in both
countries, as follows:   "A royal chamberlain is an officer whose
function is in general to attend on the person of the sovereign
and regulate the etiquette of the Palace."   The Lord Chamber-
lain in England has some duties which are not imposed upon
the Chamberlain of the Hawaiian Court, such as attending to
the histrionic matters of the royal theatres; but, as the head of
the royal household, upon whom devolves the regulation of

court etiquette, the issuing of royal invitations to receptions and parties, and the arranging of presentations at court, his functions correspond minutely with those of the office in this country. With this showing it cannot be denied that the office is a public one, that it is authorized by law, that the character of its incumbent and the manner of his performance of the duties of the office concern the relations of the government at home and abroad, and may affect the international reputation and standing of the country. The Chamberlain is not the servant of the King, or his private secretary or his business agent; he is distinctly his official attendant, the person through whom he meets the public in his capacity as Sovereign.

If this is so, can it be contended that no authority or responsibility is involved in the appointment of so important an officer? And if there is authority there is responsibility. "There can be no authority without responsibility. The King is without responsibility. The Constitution confers the responsibility of government upon the Cabinet; they therefore have the authority." (*Opinion of the Supreme Court,* August 3d, 1889.)

This national importance of the office of Chamberlain as above set forth brings the appointment within the law above quoted, passed by the Legislature on the 8th day of December, A. D. 1887, which provides that " whereas it is consistent with the spirit of the constitutional government of the Hawaiian Kingdom that the Sovereign shall act in matters of State only by the advice and with the consent of his constitutional advisers," the King shall perform those acts which he is authorized or permitted to do by virtue of the laws, "by and with the advice and consent of the Cabinet," unless the law provides otherwise. It can hardly be argued that the appointment of the Chamberlain is not a "matter of state."

An executive act is an act that carries out or executes the law. The law in providing for the salary of the Chamberlain, a public officer, provides by necessary implication for his appointment. It thus becomes strictly an executive act, like the appointment to any other statutory office.

The manner of appointment to the office of Chamberlain, pre-

vious to the revolution of 1887, has no bearing upon this issue, and no force by way of precedent, for the status of the Sovereign was radically changed by that revolution, as is shown above, and modified upon this very point of his authority in making appointments to office, which authority—or what there was of it—was entirely swept away, except as to the appointment of the Cabinet. As a matter of fact, however, for a period of fourteen years or more the Chamberlain has been appointed by royal commission under the great seal of the Kingdom, which would *prima facie* characterize such appointment as an executive act. It has also been the practice, to some extent, under the old regime to have such commissions countersigned by a Minister.

I think it may be accepted as an irresistible conclusion arising from the circumstances and enactments of the late revolutionary movement, that the King has no powers except those granted him by the Constitution. The executive power is there placed in the hands of the King and the Cabinet, and there is no remainder or surplus of executive power that is given to him to use independently, unless the appointment of the Cabinet might be so regarded.

These conclusions of law are strongly supported by the conclusions of public policy. For instance, if the position should be filled by a person who paid no attention to his official duties, or absented himself entirely from the country, or who attended to his duties in an incapable or scandalous manner, there would be no remedy unless the responsible Cabinet had the control of the office, except to wait for the succeeding session of the Legislature, which might be more than a year away.

It is a signficant fact with a direct bearing upon this question, that in England the Lord Chamberlain is appointed by the Cabinet and changes with the administration. This is because it has been found by experience that it is better for the harmonious administration of affairs that an officer holding a position so intimate, and so full of opportunity of acquiring influence with the Crown, should be in political accord with the ministry. If this reason for ministerial control of the office is

good in England, it is a matter for serious consideration whether it is not also good here. But this is an argument from policy which I do not rely upon, but call attention to the harmony that exists, as it appears to me, between the conclusions of law and the policy arising from this question.

As to the third ground of defense, *i. e.*, that the petitioner has not performed the duties of the office, and has been absent from the country during a large part of the time for which he claims to be paid, I feel, as I have suggested above, that the best remedy for such a state of things is to dismiss the official so failing to perform. But it seems to me that a person holding an office is entitled to the pay of the office in full, so long as he remains in it. To admit that the Minister of Finance has the discretion to call an official to account for lost time or incompetent performance, and investigate his official record with a view to pay him only for work actually performed, and to discount his salary accordingly, would place upon his shoulders, in addition to his other responsibilities, a duty so onerous and uncertain and easily capable of abuse as to render its performance well-nigh impracticable, and its attempt inconsistent with public policy. The obvious remedy for official dereliction is dismissal, which is one of the arguments before stated for the necessity of a responsible appointing power. A decrease by the executive of the salary of an official, fixed by law, would be in the nature of an interference with the legislation, the Legislature being the sole judge of the value to the government of the work pertaining to any office.

I feel, however, that when a person who is absent from the country is appointed to the office of Chamberlain, the duties of which require personal attendance upon the Sovereign and the presence of the incumbent at the Palace or the royal court, it might well be considered that he should not be regarded as having accepted the appointment and qualified himself as Chamberlain until he should have put in an appearance at the place where the duties were to be performed, and consequently that his pay should not begin to run until he had shown his *bona fide* acceptance of the position by his presence at the post

of duty.   My mind is, however, not fully made up upon this point.

Upon the second ground, therefore, of the defense, I am convinced that the petitioner not having shown that his alleged appointment has been made with the approval of the Cabinet, he has failed to prove that he has been legally appointed to the office of Chamberlain; he is therefore not entitled to the salary claimed, and his application for a peremptory writ of mandamus should be refused.